The bill in this case was filed to set aside two life insurance policies, — on the ground of misrepresentation or fraud in the applications therefor. This court, in and by its former final decree herein, set aside one of the policies, but held that complainant was barred from attacking the other policy, — under the limitation of the "incontestability" clause therein, and hence did not pass upon the question as to its voidability for *Page 329 
fraud or misrepresentation. Metropolitan Life Insurance Co. v.Lodzinski, 121 N.J. Eq. 183. On cross-appeals, that decree was sustained as to the cancellation of the one policy, but the appellate court decided that complainant was not barred from attacking the other policy, — and remanded the cause for action accordingly. Id., 122 N.J. Eq. 404.
The case having been fully tried at the former hearing, on the issue as to fraud or misrepresentation in the application for the policy now in question, no further evidence has been taken, but the cause has been re-argued on the evidence already before the court.
This policy is a twenty-year endowment policy for $1,000, and was issued by complainant on February 21st, 1933, in pursuance of an application by the insured dated February 19th, 1933. It was payable to the present defendant, in the event of the death of the insured. The insured died on January 17th, 1935.
Complainant bases its claim for avoidance upon the answers made by the insured to certain questions in Part B (the medical part) of the application. These questions and answers were as follows:
 (Answers)
 "7. (a) When last sick? (No answer)
 (b) Nature of last sickness? (No answer)
 (c) How long sick? (No answer)
 "9. Any physical or mental defect or infirmity?" "No"
 "11. Have you had any surgical operation, serious illness
 or accident? If yes, give date, duration and name
 of ailment." "No"
 "16. Name and address of your usual medical attendant." "None"
 "17. Have you ever had any of the following complaints or
 diseases?
 * Disease of heart * Rheumatism * *" "No"
 "18. Have you been attended by a physician during the last
 five years? If yes, give name of complaints, dates,
 how long sick, and names of physicians." "No"

At the foot of the questions and answers was a certificate which was signed by the insured and which reads as follows:
"I hereby certify that I have read the answers to the questions in Part A hereof and to the questions in Part B hereof, before signing, *Page 330 
and that they have been correctly written, as given by me, and that they are full, true and complete, and that there are no exceptions to any such answers other than as stated herein."
(One or two other questions and answers are set up in the bill, but they are understood to have been waived: there is no mention of them in complainant's briefs on this argument.)
It is adequately proven by the evidence that in fact the applicant had suffered from rheumatism or rheumatic fever and a resultant heart affection about two years prior to the date of this application; that a Dr. Wegryn came to see her at least twice at that time; that the heart condition was serious and still existed at and after the date of the application in question; and that (in the opinion of a competent, experienced and disinterested medical witness) the pulmonary tuberculosis (which was the cause of her death in January, 1935) had probably commenced a little prior to the date of the application.
Obviously, then, the answers above mentioned were not true in fact. Admittedly they were material and the policy would not have been written by the complainant company if the actual true facts had been stated in the answers. On these grounds the complainant claims the right to a decree cancelling the policy and avoiding liability in respect thereof, except for the return of the premiums paid, and interest thereon.
It is true that, — as has been established by a long line of decisions, — such rescission may be had in equity upon proof of reliance on material representations untrue in fact, without proof of conscious or intentional fraud. It is equally true, however, that the court of errors and appeals definitely established by its determination in Metropolitan Life InsuranceCo. v. Sussman, 109 N.J. Eq. 582, that where the bill of complaint, in such a suit as the present, alleges that the representations were knowingly false and fraudulent in purpose, the complainant must prove those allegations and charges or its bill will be dismissed. See, also, United Life, c., InsuranceCo. v. Winnick, 113 N.J. Eq. 288, at 290, bottom. *Page 331 
Examination of the present bill shows that it does allege and charge conscious and intentional fraud. Paragraph 16 alleges that the insured "suppressed facts and made statements contrary to fact * * * all for the purpose of inducing the complainant to issue the said policy." (Italics supplied.) Paragraph 22 alleges, as a basis for its asking relief in this court, that in defending a suit at law on the policy, "it may not be able to prove that the representations * * * were knowingly false, but may only be able to prove that they were material and untrue." (Italics supplied.) Paragraph 2 of the prayer of the bill prays decree that the policy was issued to and received by the insured "as the result of fraud, misrepresentation and deception." (Italics supplied.)
The proofs therefore must be further examined in order to determine whether or not the insured was guilty of conscious falsehood and fraudulent purpose.
As to question and answer 9, — there is no evidence that the insured knew or believed, at the time she signed the application, that she was suffering from any infirmity; on the contrary, the whole tenor and effect of the evidence is that she was thenapparently in good health and that she did not know or have reason to believe otherwise. As to this answer, therefore, there is no proof of conscious falsehood or that the reply was in anywise other than in accordance with her honest belief.
As to question 16, — there is no proof of conscious falsehood, or even any untruth in fact. There is no evidence that she had, at the date of the application, or had ever had prior thereto, any "usual" medical attendant. The actual proof goes no further than to show two visits by a Dr. Wegryn (and those two some eighteen days apart), at the time she suffered from the rheumatism in 1931.
As to questions 7, 11 and 17, they are all three substantially alike. The effect of the absence of answers to 7 a, b and c, in connection with the certificate at the end of the application, is equivalent to a statement that she never had had any sickness. But "sickness" in such statements as these is construed not to mean or include trivial, transitory or temporary indispositions or illnesses, but to mean only serious *Page 332 
illnesses — such illnesses as affect the risk. Clayton v.General, c., Assurance Co., 104 N.J. Law 364. Is there proof that she knew or believed that she had had heart disease, rheumatism or any serious illness?
It is true that she had in fact two years earlier suffered with rheumatism or rheumatic fever and a consequent heart affection which still persisted. There is no evidence that she knew this. The evidence is rather to the effect that she did not know it. The doctor who saw her at that time testifies that he did not tell her anything about it — that he did not discuss her condition with her at all, — that he discussed it only with her mother. There is no evidence as to what he told the mother about the child's condition, but he did tell her she would be entirely cured and well, and later on told her she was entirely cured and well. Other evidence is to the effect that apparently
she was cured and well. There is no evidence that at the time of this rheumatic fever the girl was at any time confined to bed or even to the house. Dr. Wegryn says that her "condition" probably lasted six to eight weeks, and that he "treated" her on the two occasions mentioned; but there is no testimony as to what this "condition" was (except that it was an attack of rheumatic fever and heart involvement) nor as to what the "treatments" were.
From all the evidence it is perfectly possible that neither the child nor her mother ever knew or had any reason to believe that there was anything the matter but a trivial and temporary, though painful, indisposition. The mother testifies that the child was never sick prior to the taking out of the policy, but that she worked steadily in a factory for a year and a half prior thereto; and there is other testimony to the same effect by close friends of the girl and co-workers with her in the factory.
Dr. Yuckman's testimony that in November, 1933, the insured gave to him "a definite history of having had rheumatic fever three years before" and that "she described the painful joints" which accompanied or were symptomatic of that disease, by no means contravenes the possibility of lack of knowledge or belief as to any real illness. That testimony is *Page 333 
not equivalent to saying, "She told me she had had rheumatic fever three years ago." It is perfectly possible that what Dr. Yuckman meant by that testimony was that the things the girl told him definitely indicated to him that she had had rheumatic fever; but there is no evidence as to what she told him except that she had had painful joints.
The most that can be said to be established by the evidence, as to the assured's own knowledge and belief as to her condition in February, 1931, is that she knew she had headaches and painful joints. There is no evidence that these were constant, nor how long they continued to recur. It can scarcely be said that headaches and pain in the joints, even if recurring over a period of two or three weeks (there is no proof that they lasted longer than that, if indeed that long) either constituted or indicated, to the knowledge or belief of the insured, any serious illness — anything other than a temporary condition, annoying but of no real moment. Clayton v. General, c., Assurance Co., supra. A cold is not a disease or sickness, within the meaning of such questions in these applications, — even if prescribed for by a physician. Metropolitan Life Insurance Co. v. McTague,49 N.J. Law 587. See, also, Prahm v. Prudential Insurance Co.,97 N.J. Law 206.
The testimony of Dr. Runnels, that in his opinion the insured had "probably" been suffering (from pulmonary tuberculosis) for "approximately" a year prior to November 6th, 1933, cannot be deemed adequate proof that she was suffering from that disease at the time of this application for insurance in February, 1933, — much less that she then knew that she was so suffering.
There remains the answer to question 18, — to the effect that the insured had not been "attended by a physician" during the previous five years. The evidence relied on to support its claim of conscious falsehood in this answer is the testimony of Dr. Wegryn relating to his treatment for the rheumatic fever. Can it be said that the evidence establishes that claim? The most that Dr. Wegryn's testimony can be said to establish is that he did "attend professionally" the *Page 334 
insured on two occasions, February 13th, 1931, and March 3d 1931, for the condition of rheumatic fever as hereinbefore discussed. But even if it be deemed that those two visits did constitute "attendance by a physician," within the meaning legally attributable to the question, as well as within the understanding of the doctor, can it be said that the insured necessarily understood them in the same way?
She was a girl of eighteen, the daughter of a foreigner; her associates were largely foreigners and children of foreigners; it is quite possible that the meaning and connotation of these words were not the same to her mind as they would be to an adult of American parentage with better education, and whose associations had been entirely with Americans. It is quite possible that to her "attendance by a physician" meant more or less constant, — daily, — attendance over a period of time; that she did not think of the two visits ten days apart as "attendance." Moreover there is not definite proof that the two treatments were in fact on visits to the house by the doctor. If they were not, it is still more easily to be believed that she did not think of them as "attendances" by a physician. Again, if she were not confined to bed or even to the house and did not know or believe that she had any sickness or anything other than headaches and pain in the joints, — (the contrary of these is not established by the evidence), — it is quite possible to believe that she did not think that she had been attended by a physician for a sickness.
The burden is on the complainant to prove by satisfactory evidence that she committed intentional fraud, — conscious falsehood. That burden is not a mere formality; and especially is this true where the person so accused is not able to testify in her own behalf. There must exist no rational theory upon which the good faith of an answer untrue in fact can be supported, before it can be said as matter of law, that the answer was made in bad faith. Prahm v. Prudential Insurance Co., supra, and cases cited.
That there was conscious falsehood in another application made two years later, is of course not proof of conscious falsehood *Page 335 
in this application. It clearly appears that this application for insurance was not on the initiative of the insured or her mother, but was the result of insistence and persuasion by the soliciting agent; also that the policy so applied for gave the least amount of insurance for the amount to be paid in premiums. These facts at least lend no support to any theory or claim of any planned intent to defraud the company.
It is concluded that complainant has failed to establish by sufficient proof its allegations of intentional fraud and conscious falsehood; and that the bill must be dismissed as to the cause of action in question.